Filed 11/12/24  P. v. Ellebracht CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER CHARLES ELLEBRACHT,<br><br>　　Defendant and Appellant. | H050723<br>(Santa Clara County<br>Super. Ct. No. C1756327) |

## I.  INTRODUCTION

A jury convicted defendant Christopher Charles Ellebracht of one count of first degree murder (Pen. Code, § 187).[1]  The trial court sentenced defendant to prison for 25 years to life.

Defendant raises two arguments on appeal.  First, he argues that the trial court violated his state and federal constitutional rights to waive representation by counsel when it denied his request to represent himself.  Second, he contends that the trial court erroneously instructed the jury concerning the relevance of evidence regarding defendant's voluntary intoxication, requiring reversal of the judgment.  For the reasons discussed below, we will affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

## II. BACKGROUND

On January 18, 2017, family members of Gin-Lu "Tommy" Shwe called 911 after Shwe failed to show up for a work appointment and a family event. In the following days, a van registered to defendant was found in a remote area near Sequoia National Park and Three Rivers, and Shwe's body was then located close to where defendant's van had been found.

Defendant worked as a general contractor and performed jobs for which Shwe, a commercial real estate broker, referred him. One job defendant was hired to perform involved restroom renovation work at a commercial property in Cupertino.

During this job, a handyman who routinely checked on the property twice found defendant in a restroom after hours. The second of these occasions took place in late 2016 or early 2017, when the handyman found defendant sleeping in a restroom about 11:00 at night. The handyman told defendant to "quit hanging out there."

On January 17, 2017, about three weeks after this second incident, defendant approached the handyman in the parking lot of the building about 1:00 p.m., carrying a six-foot level. Defendant said, " 'You want to settle this right now, motherfucker?' " causing the handyman to feel threatened. The handyman called the property manager to report the incident; the property manager in turn contacted Shwe, who said he would handle the issue. Later that same day, an employee for a business in the building heard defendant "yelling" and "arguing" with Shwe, though she could not make out what was being said. The last time Shwe was seen alive was at 9:58 p.m. that night as he left a fitness center.

After defendant's van was found, a search of the van revealed items including a receipt from a Taco Bell restaurant in Lindsay dated January 18, 2017 at night, blue latex gloves, a lighter and two "needle points that have purplish caps on them," a four-foot-long level, a "couple of trash cans" with at least one containing a Rubbermaid label, various items with suspected blood stains, and a receipt from a Home Depot in Morgan

2

Hill dated January 18, 2017 at 6:17 a.m. for a shovel.  Searches of the surrounding area found items including a "large sheet of plywood" that had what appeared to be blood on it.

Police arrested defendant in Visalia.  Defendant had Shwe's wallet on him.  Defendant repeatedly told police that his van had been stolen in Visalia, but later admitted that he lied because he was embarrassed to admit his van was stuck in the mountains.

Law enforcement also contacted defendant's mother.   Defendant had called his mother after Shwe's death and asked her to pick him up in Visalia.  Defendant's mother later testified via conditional examination that defendant told her he got his van stuck in the mud in Three Rivers and that he hiked 10 to 15 miles and then hitchhiked to Visalia.  Defendant's mother testified that she drove to Visalia, found defendant "soaking wet and dirty," and took him to a motel in Visalia.  According to a law enforcement officer's recording made days after Shwe's death, defendant's mother told law enforcement that when she picked up defendant, defendant told her that a person "gave [defendant] some problems a long time ago and he came back and got rid of him and buried him in Three Rivers and that's why he was up there."  In another law enforcement recording, defendant's mother told law enforcement that defendant told her that "he took care of him."  The law enforcement officer asked, "That he killed him?" and defendant's mother responded, "Yes, killed him."  Another law enforcement recording documents defendant's mother as relaying from defendant:  "So, he came over here to take care of a problem.  Somebody had hurt him a long time ago.  He killed the guy and took him to Three Rivers."  The law enforcement officer asked defendant's mother if defendant specified who he was talking about, and defendant's mother replied, "Somebody who hurt him a long time ago."  In another law enforcement recording, defendant's mother stated the following to law enforcement concerning her conversation with defendant:  "[W]e talked about Tommy.  How did we talk about Tommy?  Um— He said that he was

3

upset with Tommy 'cause Tommy had, um, uh, had him bid these two jobs out and um, and [defendant] had to do a whole bunch of stuff and, um, Tommy didn't give him the jobs." However, defendant's mother later testified in the conditional examination that defendant did not tell her anything about killing anyone or taking anyone to the mountains to bury.

Shwe's body was found in a grave covered by branches. Shwe's body was discovered with an orange cord wrapped around his neck and another cord wrapped around his leg and/or foot. The cord around Shwe's neck was described as "a hook, and the cord is pulled through that loop and -- in such a way that it can be pulled and tightened to cause that -- the tightness around the neck." Packaging for an orange cord matching the cord found around Shwe's neck was also found in defendant's van. A test of swabs from the plywood board found near defendant's van revealed blood stains consistent with Shwe's DNA profile, and an expert testified concerning blood stains and DNA matches for both defendant and Shwe on various items found in the van, near the van, and at the gravesite.

Investigators followed up on the Home Depot and Taco Bell receipts found in defendant's van. The investigation revealed that defendant purchased a "round shovel" from the Home Depot in Morgan Hill on the morning of January 18. Lindsay Taco Bell restaurant workers stated that defendant appeared "agitated" and "nervous" and was looking over his shoulder when he came through the restaurant's drive-through window.

An autopsy revealed that Shwe sustained both "ligature strangulation and blunt force injuries," with the blunt force injuries occurring "before death or around the time of death." The assistant medical examiner who conducted the autopsy concluded that the manner of death was homicide.

The investigation also revealed that defendant deposited a check from Shwe on the morning of January 18, 2017. The check appeared to have been altered to change the payee to defendant and to change the amount from $1,000 to $10,000.

4

A felony complaint alleged one count of murder (§ 187).  At the first transcribed proceeding in this matter, defendant presented a request to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).  After defendant acknowledged the charge he faced, the trial court asked defendant a series of questions to determine defendant's competency to represent himself.  The trial court first asked defendant to summarize his educational background, and defendant replied:  "I have a photographic memory, Your Honor, and I've read almost every book in the law library . . . ."  Defendant referenced an IQ test he had taken when he was age 10 or 11, though he stated that he did not remember what his IQ score was.  Defendant stated that he did not go to high school and was "self-taught" or "home-schooled."  Defendant stated that he "went to a few schools," but:  "The teachers would get mad at me and stuff because I would read the books and stuff.  I just sit there all day.  I already knew all the information once I read the books."

Defendant stated that he owned a contracting business, CCE Construction, and that he also used to own a business that sold "military vehicles" to the federal government, though he stated that the details regarding this previous business were classified.  He said that when this business sold military vehicles, it had about 5,000 to 10,000 employees, and he stated:  "I didn't manage the business.  Me and my father showed up, and I designed vehicles and stuff.  And that was pretty much it.  That was all my involvement in it."

The trial court then covered several aspects of trial practice with defendant, testing defendant's previous assertion that he had a photographic memory and had "read almost every book in the law library . . . ."  When the trial court asked defendant what a motion in limine is, defendant replied:  "It's been a long time since I've -- that's why I want access to the law library, to read up on all the statutes and everything."  When the trial court asked defendant what it means when a judge sustains an objection, defendant replied:  "So one of the attorneys says something, and you stricken -- not stricken it from

5

the record. Crap. It's been so long. Sorry." After the trial court asked defendant about his asserted photographic memory, the trial court asked defendant: "Since you have a photographic memory and you have read the law books, give me an example of -- a motion in limine is when each side tells the Court things they want to happen during the course of the trial. [¶] And so could you give me some examples of what kind of motions you would file?" Defendant responded that because he had not received discovery, he did not know what motions he might file. The trial court responded: "Well, even if you don't know where you would go, give me an example of anything in your studies of the law. Give me an example of any motion you may think about filing even though you may end up not filing." Defendant replied, "I don't want to talk about that at the moment," stating that this was confidential. The trial court then covered matters such as jury selection, sentence exposure, defendant's potential access to a law library, various types of motions, jury instructions, closing arguments, and posttrial motions with defendant.

The trial court noted that the form defendant submitted to request self-representation had "a lot of open spaces in it." The trial court then asked defendant how long it would take him to read two pages of the Penal Code, and defendant responded: "About 15 to 20 seconds a page." The trial court offered to have defendant read two pages of the Penal Code during the hearing to test this assertion, but defendant declined, stating that he did not sleep the previous night. The trial court similarly offered defendant the opportunity to demonstrate his reading capacity by reading one page or even half a page of the Penal Code; defendant declined, stating that conditions in the jail did not allow him to get a full night's sleep. The trial court then returned to the form defendant submitted to request self-representation, asking defendant whether the spaces he left blank represented areas he did not understand. Defendant responded by stating, "I never needed to use the law library or anything like that," before turning the subject to his previous business of building military vehicles. After further discussion about this

6

business, the trial court offered defendant the opportunity to sketch out an example of a military vehicle to test defendant's claims of a photographic memory; defendant did not take the court up on this offer. Defendant then volunteered that the initials for his company—CCE—were also his initials, and he stated: "My initials are on the back of the one-dollar bill too, Your Honor." The trial court asked defendant how this happened, and defendant replied: "You ask the United States Government. They will tell you." The trial court then directed defendant to completely fill out his self-representation request form, and defendant replied: "When I filled this out, it didn't have a backside to it. Now, it has a backside. It was like this. Only one-sided when I filled it out. We can run the tapes on camera." The trial court asked defendant whether his signature appeared on the form, and defendant said the signature was not his, stating, "I know every trick in the book, Your Honor."

The trial court then denied defendant's request to represent himself, finding that defendant was not competent to represent himself. The trial court stated: "I'm making that finding on his responses to questions that the Court has asked in reference to both his understanding of the legal system and also his responses to some of the Court's questions in terms of his experience in his companies and some of the other questions that he responded to the Court." The trial court stated that defendant would have the opportunity to "fully fill out" a request to represent himself, but for now, the trial court was finding defendant was not competent to represent himself. The trial court also stated that its ruling was without prejudice, meaning defendant could renew his request at another time.

At trial, the prosecution's witnesses included Shwe's children, bank employees concerning the check defendant deposited, the handyman at the Cupertino property and other witnesses from the two renovation projects defendant was working on leading up to the charged offense, a Home Depot employee, an employee at the fitness center where Shwe was last seen alive, employees from the Taco Bell restaurant defendant visited, law enforcement officials, a DNA expert, and the assistant medical examiner who conducted

Shwe's autopsy.  Defendant's mother also testified via a conditional examination, a recording of which was played for the jury.

Defendant testified at trial as the only witness for the defense.  Defendant testified that while he did make the statement the handyman alleged on the day of January 17, 2017, he was talking to someone on the phone, not the handyman.  Defendant testified that he was not upset with Shwe on that day and he and Shwe did not argue.  Defendant testified that Shwe referred him for construction jobs and that Shwe "was my friend" and "helped me out a lot."  Defendant testified that in the afternoon and evening of January 17, 2017, he waited by himself outside the Cupertino property in his van until everyone left so he could perform some work on the property's restrooms.  He testified that he then went into the men's restroom at nighttime and found Shwe "on the floor with something around his neck, and his face was, like, swelling up."  Defendant testified that he "kind of freaked out" both because he had been using marijuana that day and because of an incident he experienced with the police several years earlier.  Regarding his marijuana use, defendant testified that on January 17, 2017, he smoked marijuana extract with a vape pen "[m]aybe 20 times or 30 times."  Defendant then testified that he was under the influence of marijuana extract when he said he found Shwe's body.

Defendant testified that he decided to bury Shwe's body to "just clean up the job site," so he placed Shwe's body in a rubber bin and placed it in the back of his van.  Defendant testified that he placed Shwe's wallet in the bin with the body.  Defendant testified that he then drove to Visalia and Lindsay, and that he "was just going to go to the mountains, I guess, and bury him."  He acknowledged buying the shovel at the Home Depot at Morgan Hill and depositing the check from Shwe after Shwe's death, stating that he altered the check because "I was so high on marijuana that I used, like, a pencil, and it was, like -- I don't even know why I did it for."  He testified that after going to the Taco Bell in Lindsay on the night of January 18th, he drove to the area where his van was found, and his van got "stuck on a rock or something like that."  At that point, defendant

8

testified, he "just decided to bury the body not too far from there." He testified that he then hiked 15 to 20 miles before getting a ride to Visalia, where he called his mother. On cross examination, defendant admitted that he did not attempt to perform CPR on Shwe or call 911. He agreed that he was not "in a rush" to call Shwe's family, that he never called Shwe's family to tell them he had Shwe's wallet, and that he was "not in a rush to get any of [Shwe's] belongings back to his family . . . ." Finally, defendant admitted on cross-examination that he took Shwe's body from the Cupertino building with the cord wrapped around Shwe's neck "[h]undreds of miles away" and "many miles outside of civilization" without telling anyone, including a relative who was a "senior officer" at the sheriff's office in Visalia.

Concerning the relevance of defendant's testimony that he was under the influence of marijuana extract, the trial court instructed the jury in accordance with CALCRIM No. 3426 as follows: "Voluntary intoxication. You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent or mental state of malice aforethought. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of murder, as charged in Count 1, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the -- with a specific intent or mental state of malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder as charged in Count 1. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

In their closing arguments, both parties discussed the relevance of defendant's testimony about his marijuana use. The prosecutor noted that defendant testified that he has experience using marijuana and argued that defendant "wasn't so intoxicated that he couldn't remember what he did." Defendant's trial counsel argued that defendant did not

call the police when he said he discovered Shwe's body both because of defendant's previous experience with police and because he "said that he was high on concentrated marijuana or marijuana extract," noting the instruction on voluntary intoxication. Trial counsel argued: "Voluntary intoxication -- what that refers to -- it only comes into play in one circumstance. And the only circumstance it comes into play is it reduces -- if you believe that a person was voluntarily intoxicated, which means they personally ingested, not that someone did it to them, and that it affected them such, it can reduce a first degree murder to a second degree. And that's the only use of that jury instruction in this case."

In rebuttal, the prosecutor noted the voluntary intoxication instruction and the defense's position that defendant used marijuana extract, arguing: "You've had no evidence whatsoever of what it actually was. No forensic evidence to tell you what kind of concentration it was or an expert to explain what the effects would be on the human body. And the testimony about this was purposefully limited because of this instruction. [¶] You can consider evidence, if any, of a defendant's voluntary intoxication but only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent or mental state. You cannot hear that he voluntarily became intoxicated and think, well, he's incapable of committing the crime. [¶] Someone would be so intoxicated that they couldn't form the intent to kill -- a very clear and strong intent -- if they were so wasted they were falling over themselves." The prosecutor then argued that the evidence that defendant strangled Shwe meant that voluntary intoxication was not a defense, continuing by stating: "Voluntary intoxication, bear in mind, is taking something that -- a drug or drink or other substance that would knowingly produce an effect. That you willingly assume the risk of that substance. [¶] It's not a catchall defense or excuse. You don't get to get high and do whatever you want." The prosecutor asserted that defendant raised his marijuana use "[b]ecause he wanted to use it as an excuse, not just for potentially the killing, but for everything he said, for everything he says he couldn't remember." The prosecutor then argued that the evidence of marijuana

10

extract use did not negate malice aforethought, noting matters such as the likely passage of time between defendant's marijuana extract use and the killing and defendant's testimony that he planned to do renovation work that night, concluding: "He wasn't so high that he forgot his actions. And he wasn't so high that he couldn't commit those actions or form that intent."

The jury convicted defendant of first degree murder. The trial court imposed a sentence of 25 years to life in prison. This appeal followed.

### III. DISCUSSION

#### A. *Denial of Defendant's Request to Represent Himself*

Defendant argues that the trial court violated his right to self-representation by denying his *Faretta* request. Defendant asserts that the trial court erred because he "timely demonstrated a sufficient understanding of the charge, his sentence exposure, courtroom proceedings and the risks of foregoing representation by counsel to be competent to waive counsel and represent himself." He further argues that the error is structural and thus is not reviewable for prejudice. The Attorney General responds by asserting that the trial court acted within its discretion in determining that defendant was not competent to represent himself. The Attorney General contends that defendant's "reasons for failing to complete his waiver form, as well as his various delusional statements at the *Faretta* hearing, constituted substantial evidence that he suffered from severe mental illness such that he could not 'carry out the basic tasks needed to present the defense without the help of counsel.' " We agree with the Attorney General's position.

#### 1. Legal Principles and Standard of Review

In *Faretta*, "the United States Supreme Court held that the Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 425.) "The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right

11

to represent himself [or herself] if he [or she] voluntarily and intelligently so chooses. [Citation.]  A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently.  [Citation.]" (*People v. Wright* (2021) 12 Cal.5th 419, 435–436.)  "As the high court has stated, however, '*Faretta* itself and later cases have made clear that the right of self-representation is not absolute.'  [Citations.]  Thus, a *Faretta* motion may be denied if the defendant is not competent to represent himself [or herself] [citation], is disruptive in the courtroom or engages in misconduct outside the courtroom that 'seriously threatens the core integrity of the trial' [citations] or the motion is made for purpose of delay [citation]." (*People v. Lynch* (2010) 50 Cal.4th 693, 721–722.)

"When a defendant makes an unequivocal request for self-representation, the trial court must determine whether the defendant is competent to waive the right to counsel, that is, whether the defendant is able to understand the nature and object of the proceedings and the risks and dangers of self-representation.  [Citations.]  In order to do so, the court must discuss with the defendant the consequences of self-representation . . . . [Citation.]  But in determining whether a defendant is competent to choose self-representation, ' "[t]he trial court is not concerned with the wisdom of defendant's decision to represent himself [or herself], or with how well he [or she] can do so.  The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation. . . ." '  [Citation.]  ' "[A] criminal defendant's ability to represent himself [or herself] has no bearing upon his [or her] competence to choose self-representation." '  [Citation.]" (*People v. Best* (2020) 49 Cal.App.5th 747, 756–757 (*Best*).)

In *People v. Johnson* (2012) 53 Cal.4th 519, 523 (*Johnson*), the California Supreme Court held that "California courts may deny self-representation when the United States Constitution permits such denial."  Our state Supreme Court noted that the United

12

States Supreme Court has "described competence to represent oneself at trial as the ability 'to carry out the basic tasks needed to present [one's] own defense without the help of counsel.' [Citation.]" (*Id.* at p. 530.) The California Supreme Court in *Johnson* noted that in *Indiana v. Edwards* (2008) 554 U.S. 164, 178, the United States Supreme Court "said the states may deny self-representation to those competent to stand trial but who 'suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves,' " and that although the United States Supreme Court was "asked to adopt 'a more specific standard,' the high court declined to do so. [Citation.]" (*Johnson*, *supra*, at p. 530.) The California Supreme Court in *Johnson* stated that "we also think it is best not to adopt a more specific standard." (*Ibid.*) Instead, the California Supreme Court stated, "pending further guidance from the high court, we believe the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Ibid.*)

Section 1369, subdivision (a)(1) states concerning a defendant's competence to stand trial: "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant." The California Supreme Court in *Johnson* cited this provision and stated: "Similarly, when it doubts the defendant's mental competence for self-representation, [the trial court] may order a psychological or psychiatric examination to inquire into *that* question. To minimize the risk of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' [Citation.]" (*Johnson*, *supra*, 53 Cal.4th at pp. 530–531.) Thus, "[a]bsent evidence of obvious mental illness, a trial judge who has no prior knowledge of the

13

defendant or his [or her] mental competence should not deny a *Faretta* request without an expert evaluation based solely on its own nonexpert perception of the defendant's mental acuity at the *Faretta* hearing." (*People v. Orosco* (2022) 82 Cal.App.5th 348, 361 (*Orosco*).)

"The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence. [Citation.]" (*Johnson*, *supra*, 53 Cal.4th at p. 531.)

### 2. Analysis

We conclude that substantial evidence supports the trial court's conclusion that defendant was incompetent to represent himself, and thus the trial court's ruling denying defendant's *Faretta* request must be upheld.

Defendant's actions and statements demonstrated his incompetence to represent himself. Defendant left large portions of his request to represent himself blank. Defendant completed no information about his education and employment background; he failed to initial several statements about whether he understood what his request entailed; and he did not list any information concerning his potential sentence exposure or potential defenses available to him. When the trial court questioned defendant about his reason for failing to properly complete his request form, defendant resorted to allegations that the form and his signature had been altered. The instant case is distinguishable from *Orosco*, where the reviewing court held that the trial court erred in denying a *Faretta* request "[b]ased solely on its perception of Orosco's confusion about two questions on the *Faretta* waiver form . . . ." (*Orosco*, *supra*, 82 Cal.App.5th at p. 359.) Defendant's omissions in completing the form in the instant case were more extensive than in *Orosco*, and his stated reasons for the omissions did not involve confusion but rather unsupported claims that the form had been altered and his signature

14

had been forged.[2]  Defendant's inability to complete the waiver request form and his stated reasons for not doing so provide substantial evidence supporting the trial court's conclusion that defendant lacked " ' "the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation.  . . ." ' [Citation.]" (*Best*, *supra*, 49 Cal.App.5th at p. 757.)

Defendant's other statements at the *Faretta* hearing further support the conclusion that he lacked competence because he suffered from a "severe mental illness" to the point where he could not "carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, 53 Cal.4th at p. 530.)  Defendant alleged that he had "read almost every book in the law library" when he was 14 years old and possessed a photographic memory, but he struggled to answer several questions regarding criminal procedure, citing his lack of self-study concerning the law over the ensuing 24 years. While a " ' "criminal defendant's ability to represent himself [or herself] has no bearing upon his [or her] competence to choose self-representation" ' " (*Best*, *supra*, 49 Cal.App.5th at p. 757), defendant's deficiencies in explaining aspects of criminal procedure were relevant to whether his claims of possessing a photographic memory were true, or whether his claims were the result of a severe mental illness.  Defendant asserted that he had a photographic memory and was able to speed read legal books, but he stated that he could not remember matters including his IQ score and the year he began his business, and he declined the trial court's offered opportunities to demonstrate his abilities by reading a portion of the Penal Code or drawing a military vehicle at the hearing.  Defendant made assertions about his capabilities and background that the trial court—which viewed defendant in person—could reasonably conclude were indicative of

---

[2] Defendant also asserted that the self-representation form he completed was not the same as the one the trial court had before it at the hearing because the form he completed "didn't have a stamp on it either."  The trial court noted that the court placed the stamp on the form after defendant submitted it, and defendant replied:  "That makes it not the document that I filled out then."

15

a severe mental illness. For example, defendant asserted that he owned a company that sold military vehicles to the United States government and that the federal government placed his initials on the one dollar bill. Defendant's statements, combined with his inability to complete large portions of his self-representation request, provide substantial evidence supporting the trial court's conclusion that defendant suffered from a severe mental illness to the point where he could not carry out the basic tasks to present his defense without the assistance of counsel.

Defendant argues on appeal that the trial court erred by not obtaining an expert evaluation to support its conclusion that defendant was not competent to represent himself. However, our Supreme Court has declined to impose a requirement for the trial court to obtain an expert evaluation when determining whether a defendant is competent to represent himself or herself. In *Johnson*, our Supreme Court stated merely that " 'trial courts should be cautious about making an incompetence finding without the benefit of an expert evaluation . . . .' " (*Johnson*, *supra*, 53 Cal.4th at pp. 530–531.) The California Supreme Court also stated that " 'the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' [Citation.]" (*Id.* at p. 531.) Here, the trial court's observations about defendant's in-court behavior provided substantial evidence to support the trial court's incompetence finding, and the court placed its observations on the record. While "[a]bsent evidence of obvious mental illness, a trial judge who has no prior knowledge of the defendant or his [or her] mental competence should not deny a *Faretta* request without an expert evaluation based solely on its own nonexpert perception of the defendant's mental acuity at the *Faretta* hearing" (*Orosco*, *supra*, 82 Cal.App.5th at p. 361), here defendant's actions and statements provided such "evidence of obvious mental illness," and thus the trial court was not required to obtain an expert evaluation of defendant.

16

Expert evaluations of defendant after the trial court denied defendant's *Faretta* request confirm the correctness of the trial court's determination that defendant suffered from a severe mental illness that rendered him incompetent to represent himself. Less than four months after the trial court's ruling on defendant's *Faretta* request, defendant's trial counsel declared a doubt as to defendant's competency to stand trial, citing statements defendant made when he was arrested, and the trial court ordered defendant to be evaluated. Ensuing evaluations concluded that defendant suffered from a mental health condition that rendered him incompetent to stand trial. For example, in an October 2017 evaluation report, a mental health provider stated that defendant revealed "grandiose ideation including that he had a photographic memory, fathered more than 200 children since he was 12 years old, and has a lot of financial means to support the children without much evidence to support these claims," that defendant "revealed paranoid ideations including that the correctional officers were raping him and concealing discovery material from him," and that defendant demonstrated a "thought process being tangential meaning that he would easily drift to another topic." This report catalogued defendant's history of mental health issues, including an episode that transpired one day before the hearing on defendant's *Faretta* motion. Thus, the evaluator diagnosed defendant with "Schizophrenia, Multiple Episodes, Severe." This evaluation concluded that defendant "lacks the capacity to have a rational understanding of the proceedings against him along with rationally assisting counsel in his own defense." A second evaluation similarly diagnosed defendant with mental health issues and as incompetent to stand trial. A placement recommendation also noted that defendant "continued to present with paranoid delusions and symptoms that could not be kept in remission," and it also cited records that stated that in the month before defendant's *Faretta* hearing, " 'reportedly he was off psychotropic medications . . . but has never been compliant to medications and nor [*sic*] had a regular follow-up with mental health services in the community.' "

17

While the trial court did not have the benefit of these expert evaluations at the time it denied defendant's *Faretta* request, these evaluations provide further confirmation that the trial court's incompetency finding was supported by substantial evidence. It was not until June 2018 that a mental health professional recommended that defendant be returned as competent to stand trial, noting that defendant was compliant with taking psychotropic medications. Even though the trial court advised defendant at the hearing on the *Faretta* request that he could renew his request at any point, defendant did not do so after his mental health stabilized to the point where he could stand trial. The evidence supports the conclusion that defendant lacked competence because he suffered from a severe mental illness to the point where he could not "carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, 53 Cal.4th at p. 530.) Because the trial court's determination regarding defendant's incompetence to represent himself is supported by substantial evidence, it must be upheld. (*Id.* at p. 531.)

## B. *Voluntary Intoxication Instruction*

Defendant next asserts that the trial court erred in its instruction concerning the relevance of evidence regarding his voluntary intoxication. We agree that the trial court's instruction was erroneous, but we conclude that the error was harmless.

### 1. Legal Principles and Standard of Review

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).)

18

Section 29.4, subdivision (a) states: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." However, section 29.4, subdivision (b) provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." "Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (*Id.*, subd. (c).)

"When voluntary intoxication became subsumed by diminished capacity, it was treated as a part of the defense of diminished capacity. [Citations.] The withdrawal of diminished capacity as a defense removes intoxication from the realm of defenses to crimes. Intoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite mental state. Thus it is now more like the 'pinpoint' instructions . . . to which a defendant is entitled upon request." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) For the court to give an instruction on voluntary intoxication, there must be "evidence from which a reasonable jury could conclude defendant's mental capacity was so reduced or impaired as to negate the required criminal intent. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 848.) "A jury may consider evidence of voluntary intoxication in determining whether a defendant had the requisite mental state for first degree murder." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1012 (*Castillo*).)

CALCRIM No. 3426, which was modified for use in the instant case, is titled "Voluntary Intoxication (Pen. Code, § 29.4)." It states in relevant part as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited

19

way.  You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with _____<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .' or 'the intent to do the act required'>."  It further states:  "You may not consider evidence of voluntary intoxication for any other purpose."

CALCRIM No. 625, which was not used in the instant case, is titled "Voluntary Intoxication:  Effects on Homicide Crimes (Pen. Code, § 29.4)."  It states in relevant part: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant _____ <insert other specific intent required in a homicide charge or other charged offense>.]"  Similarly to CALCRIM No. 3426, CALCRIM No. 625 further states:  "You may not consider evidence of the defendant's voluntary intoxication for any other purpose."  A note concerning CALCRIM No. 625 states, "This instruction is a specific application of CALCRIM No. 3426, *Voluntary Intoxication*, to homicide."

### 2. Analysis

As outlined above, the trial court instructed the jury in accordance with CALCRIM No. 3426 that the jury could consider evidence of defendant's voluntary intoxication "only in deciding whether the defendant acted with the specific intent or mental state of malice aforethought."  The instruction further informed the jury that it "may not consider evidence of voluntary intoxication for any other purpose."[3]  We

---

[3] As stated above, this instruction read in total as follows:  "Voluntary intoxication.  You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with the specific intent or mental state of malice (continued)

conclude that the trial court's use of CALCRIIM No. 3426 instead of CALCRIM No. 625 erroneously instructed the jury concerning the possible impact of voluntary intoxication evidence as to first degree murder, but that the error was harmless.

The appellate record does not demonstrate which party requested CALCRIM No. 3426, or whether the trial court instead decided sua sponte to give this instruction. The prosecution's trial brief did not list this among its proposed instructions and a trial brief from the defense is not included in the appellate record. At no point in the appellate record did defendant's trial counsel request this instruction, and no mention of this specific instruction appears in the record until the trial court delivered the instruction to the jury. The trial court conducted a discussion with the parties concerning proposed jury instructions, but this discussion was not placed on the record. Based on the absence of information in the record as to who requested CALCRIM No. 3426, the Attorney General does not contend that this issue implicates either forfeiture or invited error. Therefore, we do not address forfeiture or invited error, or defendant's alternate claim that he received ineffective assistance of counsel if this issue is not preserved for appeal.

### a. The voluntary intoxication instruction was erroneous.

Defendant's jury was instructed that it could not consider evidence of defendant's voluntary intoxication "for any other purpose" except whether defendant acted "with the specific intent or mental state of malice aforethought." This instruction is incorrect. Section 29.4, subdivision (b) states that evidence of voluntary intoxication is admissible on the issue of whether the defendant "actually formed a required specific intent, or,

---

aforethought. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of murder, as charged in Count 1, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the -- with a specific intent or mental state of malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder as charged in Count 1. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

21

*when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought*." (Italics added.) The instruction therefore should have stated that the jury could consider evidence of defendant's voluntary intoxication not only when deciding whether defendant acted with malice aforethought, but also when deciding whether defendant premeditated and deliberated in killing Shwe. This is precisely what CALCRIM No. 625 states, instructing the jury that it may consider evidence of the defendant's voluntary intoxication "in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation . . . .]" The trial court erred by not properly tailoring CALCRIM No. 3426—an instruction intended for offenses other than first degree murder—instead of using CALCRIM No. 625.

The Attorney General argues that it is not reasonably likely that the jury construed CALCRIM No. 3426 to preclude consideration of defendant's voluntary intoxication evidence as to whether defendant acted with premeditation and deliberation. The Attorney General contends that because the instruction used in this case told the jury that they could consider evidence of defendant's voluntary intoxication in deciding whether defendant acted "with the specific intent *or* mental state of malice aforethought" (italics added), the instruction allowed the jury to consider the evidence as to "specific intent" (premeditation and deliberation) or as to the "mental state of malice aforethought." Thus, the Attorney General argues: "The relevant instructions, when viewed together, correctly explained how to consider evidence of voluntary intoxication. CALCRIM No. 3426 told jurors that they could consider voluntary intoxication for the two distinct types of mental states applicable to the charge of murder, 'specific intent' and 'malice aforethought.' CALCRIM No. 520 explained to the jury that malice aforethought, either express or implied, is the mental state for second degree murder. CALCRIM No. 521 further explained that first degree murder requires the additional specific intent of premeditation and deliberation. Thus, the instructions as a whole . . . correctly informed the jury that

22

intoxication could be considered in deciding whether [defendant] harbored the specific intent of deliberation and premeditation. . . . Indeed, the wording of the instruction made it impossible for jurors to consider the effect of voluntary intoxication on intent to kill without also considering its effect on premeditation and deliberation."

However, section 29.4 differentiates between "specific intent" and premeditation and deliberation, stating that evidence of voluntary intoxication is admissible on the issue of whether the defendant "actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) Nothing in the version of CALCRIM No. 3426 used in this case informed the jury that premeditation and deliberation are "specific intents" for which it could consider evidence of voluntary intoxication. Instead, the instruction informed the jury that it could consider this evidence "in deciding whether the defendant acted with the specific intent or mental state of malice aforethought." The most logical understanding the jury would have had of this instruction would be that "specific intent" and "mental state" both referred to malice aforethought. This interpretation is buttressed by later language in the instruction that the prosecution had the burden of proving beyond a reasonable doubt that defendant acted "with a specific intent or mental state of malice aforethought." This instruction referred to the use of voluntary intoxication evidence to prove murder generally by proving express malice; it did not reference premeditation or deliberation. Instead, it informed the jury: "You may not consider evidence of voluntary intoxication for any other purpose." The jury would have reasonably understood that premeditation and deliberation were among the "other purposes" for which voluntary intoxication evidence could not be considered. In addition, contrary to the Attorney General's argument, nothing in CALCRIM No. 521

23

informed the jury that premeditation and deliberation are "specific intents," language that could have linked CALCRIM No. 3426 to the requirements to prove first degree murder.[4]

The California Supreme Court's decision in *Castillo*, *supra*—which analyzed another voluntary intoxication instruction—provides guidance to support the conclusion that the trial court here erred in instructing the jury concerning evidence of voluntary intoxication. In *Castillo*, the California Supreme Court held that trial counsel was not ineffective "for failing to request a 'pinpoint' jury instruction specifically relating voluntary intoxication to premeditation and deliberation." (*Castillo*, *supra*, 16 Cal.4th at p. 1012.) The defendant testified at trial "that he had smoked PCP before the shootings, and that it made him dizzy and affected his mental state." (*Id.* at p. 1013.) The defendant was convicted of first degree murder where the sole theory was premeditation and deliberation. (*Ibid.*) The trial court instructed the jury concerning voluntary intoxication in accordance with CALJIC No. 4.21.1, which stated in relevant part as follows: " 'Under the law, it is a general rule that no act committed by a person while in the state of voluntary intoxication is less criminal by reason of being in such condition. However,

---

[4] The trial court instructed the jury in accordance with CALCRIM No. 521 in relevant part as follows: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [¶] The defendant acted willfully if he intended to kill. [¶] The defendant acted deliberately if he carefully weighed the considerations for or against his choices and, knowing the consequences, decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the act that caused the death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for premeditation and -- strike that -- for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of the time. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

24

there is an exception to this general rule, namely, where a specific intent or mental state is an essential element of the crime. In such event, you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime. [¶] Thus, in the crimes of murder and attempted murder . . . a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crimes set forth elsewhere in these instructions. [¶] If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether or not such defendant had such specific intent or mental state. [¶] If from all the evidence you have a reasonable doubt whether the defendant had such specific intent or mental state, you must find the defendant did not have such specific intent or mental state.' " (*Castillo*, *supra*, at p. 1014, fn. 2.)

Our Supreme Court held that "the trial court correctly and fully instructed the jury on the way in which the evidence of intoxication related to defendant's mental state, including premeditation." (*Castillo*, *supra*, 16 Cal.4th at pp. 1015–1016.) The court in *Castillo* stated: "The trial court expressly referred to an exception 'where a specific intent *or mental state* is an essential element of the crime.' . . . No reasonable juror would understand the instructions to permit the jury to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated. Premeditation and deliberation are clearly mental states; no reasonable juror would assume otherwise. Moreover, they refer to the quality of the intent to kill. By relating intoxication to mental state, the instruction necessarily directed the jury's attention to evidence of intoxication as it related to premeditation and deliberation. It is not reasonably likely the jury misconstrued the instructions as precluding it from considering the evidence of PCP use in deciding the degree of the murder. [Citation.]" (*Id.* at p. 1017.) Thus, the California Supreme Court concluded that trial counsel was not

25

ineffective because "an additional instruction stating the obvious--that premeditation is a mental state--was unnecessary." (*Id.* at p. 1018.)

The voluntary intoxication instruction in the instant case is different from that in *Castillo*, demonstrating that the trial court here erred. The instruction in *Castillo* informed the jury that evidence of the defendant's voluntary intoxication should be considered in determining whether the defendant " 'possessed the required specific intent or mental state at the time of the commission of the alleged crime,' " with no further restriction concerning the " 'specific intent or mental state' " for which this evidence could be considered. (*Castillo*, *supra*, 16 Cal.4th at p. 1014, fn. 2.) By contrast, the voluntary intoxication in the instant case informed the jury that it could consider evidence of defendant's voluntary intoxication "only in deciding whether the defendant acted with the specific intent or mental state of malice aforethought." By referring to only one "specific intent or mental state"—malice aforethought—and by limiting the jury's consideration "only" to this one specific intent or mental state, the instruction here precluded the jury from considering voluntary intoxication evidence in determining whether defendant acted with premeditation and deliberation. Moreover, the instruction in the instant case emphasized that the jury "may not consider evidence of voluntary intoxication for any other purpose," language not utilized in the *Castillo* instruction. Thus, *Castillo* supports the conclusion that the trial court's voluntary intoxication instruction here was erroneous. Viewed in the context of the instructions as a whole and the trial record, we conclude that there is a reasonable likelihood that the jury applied the voluntary intoxication instruction in an impermissible manner, and thus the instruction was erroneous. (*Mitchell*, *supra*, 7 Cal.5th at p. 579.)

### b. The error was harmless.

In his opening brief, defendant argues that the error is reversible as a "miscarriage of justice," asserting that under this test, an instructional error is reversible "if there is a reasonable probability of a different result in the absence of the error." Thus, he argues

26

that he "is entitled to a new trial because had the jury been correctly instructed, there is a reasonable probability it would not have unanimously agreed on first degree murder." He also contends that the error may be reversible as "a deprivation of due process under the Fourteenth Amendment if it results in a fundamentally unfair trial." The Attorney General acknowledges in response that a narrow category of instructional errors could rise to the level of a due process violation, but argues that most claims of instructional error concerning voluntary intoxication are reviewed under the state law standard laid out in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Absent a due process violation, the Attorney General asserts, the test under *Watson* is whether there is a "reasonable probability that [defendant] would have obtained a more favorable outcome but for the alleged misinstruction on voluntary intoxication." In reply, defendant agrees that "California courts generally review refusal to provide a requested pinpoint instruction under the miscarriage of justice standard." However, defendant argues for the first time that because the voluntary intoxication instruction in his case violated his due process rights, this issue is subject to analysis under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under this standard, defendant argues, the error is not harmless because this court "cannot conclude beyond a reasonable doubt that a rational juror properly instructed[] would have reached the same verdict."

Our Supreme Court has repeatedly stated that errors concerning voluntary intoxication instructions are reviewable under the reasonably probable standard. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 896–899 [erroneous voluntary intoxication instruction concerning aider and abettor liability did not violate due process and thus the question was whether it was reasonably probable the error affected the verdict adversely to the defendant]; *People v. Pearson* (2012) 53 Cal.4th 306, 325 (*Pearson*) [failure to instruct on voluntary intoxication in relation to the specific intent to torture reviewable for prejudice under the reasonable probability test]; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 187 [assumed erroneous voluntary intoxication instructions concerning aider

27

and abettor liability were harmless because it was not "reasonably probable that different instructions would have resulted in a verdict more favorable to defendants"]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134–1135 (*Mendoza*) [error in voluntary intoxication instruction concerning aider and abettor liability is subject to standard for state law error].) We also note, as the Attorney General observes, that the United States Supreme Court has stated that in reviewing jury instructions for a due process violation, "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.' [Citation.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 73.) We therefore determine that this error should be reviewed under the *Watson* standard for harmlessness by determining whether it was reasonably probable that the error affected the jury's verdict adversely to defendant.

In reaching this determination, we recognize that "[a] jury instruction that relieves the prosecution of its burden to prove an element of the crime—by either misdescribing the element or omitting it entirely—violates [the federal Constitution]." (*People v. Hendrix* (2022) 13 Cal.5th 933, 942 (*Hendrix*); see also *People v. Schuller* (2023) 15 Cal.5th 237, 243 (*Schuller*) [citing *Hendrix* in holding that "when the record contains substantial evidence of imperfect self-defense, the trial court's failure to instruct on that theory amounts to constitutional error and is thus subject to review under the federal *Chapman* standard"].) Here, the error did not relieve the prosecution of its burden to prove premeditation and deliberation; instead, it erroneously instructed the jury that it could not consider evidence of defendant's voluntary intoxication in determining whether defendant acted with premeditation and deliberation. (See *Pearson*, *supra*, 53 Cal.4th at p. 325, fn. 9 ["The failure to give a fully inclusive pinpoint instruction on voluntary intoxication did not, contrary to defendant's contention, deprive him of his federal fair trial right or unconstitutionally lessen the prosecutor's burden of proof"].) As our Supreme Court held in *Mendoza*, when an instructional error precludes the jury from considering evidence of voluntary intoxication in deciding whether the prosecution met

28

its burden to establish a necessary mental state, "[a]ny error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' [Citation.]" (*Mendoza*, *supra*, 18 Cal.4th at pp. 1134–1135.) We therefore review this error to determine whether it is reasonably probable that the error affected the verdict adversely to defendant.

Under this standard, we conclude that the error was harmless. The record here demonstrates that it is not reasonably probable that the jury would have found premeditation and deliberation were not established had the jury been instructed that it could consider evidence of defendant's voluntary intoxication on this question.

The evidence regarding defendant's purported marijuana extract use was limited. Trial counsel argued at one point that defendant's intoxication could reduce his culpability from first degree murder to second degree murder. However, defendant's testimony was that he did not commit the murders, not that his voluntary intoxication reduced his culpability from first degree to second degree murder. At several points, defendant testified that his marijuana extract use impacted his decision to bury Shwe's body or his memory of events, but given the defense strategy, defendant did not testify that his marijuana extract use impacted his decision to kill Shwe. Thus, defendant did not testify that he lacked premeditation and deliberation based on his asserted marijuana extract use.[5] In accordance with this strategy, the evidence concerning defendant's purported use of marijuana extract was limited to his testimony. Defendant's credibility

---

[5] Defendant's trial counsel asked defendant at two points how his marijuana use affected him, and the trial court sustained objections to these questions on relevance and Evidence Code section 352 grounds, with the prosecutor stating: "State of mind is not relevant on this issue. And there's an instruction on that topic." However, these questions came in the context of describing defendant's actions after Shwe's death, and given the defense strategy of denying responsibility for Shwe's death, there is no indication that defendant would have testified that his marijuana use caused him to not premeditate or deliberate in killing Shwe.

29

was compromised by factors such as his admitted lie to police that his van was stolen and the lack of credibility regarding his account of deciding to bury Shwe in a remote location after finding his body in the restroom. The defense offered no other evidence to demonstrate that defendant was intoxicated to the point that it might have affected whether he premeditated and deliberated in killing Shwe. Two "needle bits with purplish caps and a blue lighter" were located in defendant's van. Defendant testified that he used the needles to load marijuana extract into a vape pen, but no evidence confirmed that the needle materials contained any marijuana extract residue, and the appellate record provides no indication that a vape pen was found in the van or on defendant. Defendant testified that he believed he "threw [the vape pen] away on the way down the hill," though he asserted that he was still "really high on marijuana" when he later spoke to his mother. As the prosecutor noted in his closing argument, no evidence was presented regarding the actual nature of any substance defendant ingested or what effects it would have on defendant's mental state on the night of the murder.

Defendant testified on cross-examination that he found Shwe's body when defendant arrived to perform renovation work on the restrooms, and he admitted that he was not so intoxicated that he could not perform the renovation work, acknowledging that it would be "illegal" to do renovation work while intoxicated to the point that it would affect his work and that he "like[s] to do things legal." Shwe was last seen alive at 9:58 p.m. on January 17, 2017, meaning the murder took place at some point after that. Defendant purchased the shovel at the Home Depot in Morgan Hill at 6:17 a.m. the following morning. This means that in the span of approximately eight hours, defendant was able to commit the murder, load Shwe's body into a Rubbermaid container, move the container into his van, and drive to the Home Depot in Morgan Hill, before later driving to Lindsay and ultimately to the gravesite near Three Rivers. Defendant agreed on cross-examination that he had been "smoking cannabis a long time" and that he knew how cannabis affected him. The prosecutor asked defendant: "You keep saying that you were

30

high. Were you so high that you might have killed [Shwe] and not remembered it?" Defendant replied, "No."

Under these facts, the record demonstrates that it is not reasonably probable that the jury would have found defendant not guilty of first degree murder if it was instructed that it could consider voluntary intoxication evidence as to whether defendant acted with premeditation and deliberation. Defendant did not testify that his use of marijuana extract impacted his mental state in committing the murder, only that it impacted his memory on certain matters and his decision to bury Shwe instead of call law enforcement upon purportedly finding Shwe's body. Even on this point, defendant did not allege that his marijuana extract use affected his ability to form the intent to bury Shwe's body. Rather, he testified that his marijuana extract use, combined with his previous negative experience with law enforcement, caused him to be "scared." On appeal, defendant asserts that his intoxication "compromised his ability to cope with the situation he found in the bathroom," a different question than whether he killed Shwe with premeditation and deliberation. Defendant's purported marijuana extract use did not affect his ability to load the body into the van, to drive to different locations, and to carefully plan and execute the burial of Shwe's body in a remote location. Given the limited evidence supporting defendant's claim of voluntary intoxication, it is not reasonably probable the jury would have reached a different result concerning premeditation and deliberation had it been properly instructed.

This conclusion is buttressed by the evidence demonstrating defendant's premeditation and deliberation in killing Shwe. The manner of the killing demonstrated that defendant was not so intoxicated that he did not premeditate and deliberate in killing Shwe. Shwe was strangled to death, a death that the expert assistant medical examiner testified took "three to five minutes putting pressure on the neck leading to death." Shwe's body was found with an orange cord wrapped around his neck, with "the orange ligature tightened through a hook with a clasp closure so that it was a loop[.]" After

31

several questions on cross-examination, defendant admitted that "it appears" and was "most likely" that he had purchased the cord that was found around Shwe's neck.  Shwe also sustained numerous blunt force injuries inflicted before or at the time of death, including a "significant amount of blunt force trauma to the face."  The prosecution also presented evidence of phone records that defendant called and texted Shwe before the time of the killing and the murder took place at night with no eyewitnesses, evidence the jury could reasonably conclude demonstrated planning activity.  In addition, the prosecution presented evidence of defendant's motive in killing Shwe, including testimony of a witness who heard defendant and Shwe arguing earlier in the day, evidence of defendant attempting to deposit an altered check for $10,000 from Shwe, and, most notably, the statements from defendant's mother including that defendant was "upset" with Shwe over not receiving two jobs, that defendant "came over here to take care of a problem" concerning "[s]omebody [who] had hurt him a long time ago" and that defendant "killed the guy and took him to Three Rivers."  The prosecution presented evidence about the particular and exacting manner of the killing, defendant's planning activity before the killing, and defendant's motive arising out of his prior relationship with Shwe, evidence that supports a finding of first degree murder.  (*People v. Lee* (2011) 51 Cal.4th 620, 636.)  The strength of the evidence supporting a finding of premeditation and deliberation is a consideration in determining that the instructional error here was harmless.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 177 [in determining whether an instructional error is harmless under the *Watson* test, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result"], overruled in part on another ground in *Schuller*, *supra*, 15 Cal.5th at p. 260, fn. 7.)

32

In considering the totality of the record, we conclude that it is not reasonably probable that a result more favorable to defendant would have been reached absent the erroneous voluntary intoxication instruction.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)  We will therefore affirm the judgment.

## IV.  DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

GROVER, J.

_____

LIE, J.

*People v. Ellebracht*
**H050723**